United States District Court
Southern District of Texas
**ENTERED**
February 06, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MILTON KEITH PERKINS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. H-21-3962 |
| v. | § | |
| | § | |
| LONNIE TOWNSEND, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Milton Keith Perkins, a state prisoner proceeding *pro se* and *in forma pauperis*, filed a civil lawsuit under 42 U.S.C. § 1983 against Texas Department of Criminal Justice ("TDCJ") employee Senior Warden Lonnie Townsend and University of Texas Medical Branch ("UTMB") employees Edgar Hulipas, M.D., nurse practitioner ("NP") Martha Beck, and physician assistant ("PA") Robert D. Wilkins (collectively "defendants"). Defendants filed a motion for summary judgment (Docket Entry No. 45), to which plaintiff filed a response (Docket Entry No. 64) and defendants filed a reply (Docket Entry No. 73).

Having considered the motion for summary judgment, the response and reply, the probative summary judgment evidence, the record, the pleadings, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons shown below.

# I. BACKGROUND AND CLAIMS

Plaintiff is a former TDCJ prisoner who is currently confined in the Riverbend Maximum Security Institution in Tennessee serving a twenty-year sentence for aggravated robbery. He complains that defendants were deliberately indifferent to his serious medical needs at the TDCJ Jester III Unit as to a skin lesion on his scalp and his hepatitis C infection. These two medical conditions will be addressed separately.

A.    Skin Lesion

Plaintiff first noticed a skin lesion on his left temple in February 2020 while incarcerated at the Jester III Unit. He brought it to the attention of prison medical staff on March 2, 2020, and was seen by defendants Hulipas and NP Beck two days later on March 4, 2020. No diagnosis of the lesion was made at that time, and Hulipas requested an expedited referral for plaintiff to be seen by a dermatologist at UTMB Hospital Galveston ("HG") to rule out basal cell carcinoma.[1] Plaintiff told Beck and Hulipas during the March 4th appointment that he had been granted parole and was scheduled to be extradited to

---

[1]UTMB Correctional Managed Care utilizes the following categories of specialty referrals: Routine Referrals for non-life or limb threatening conditions that are stable or longstanding, which are to be scheduled within six months of approval; Expedited Referrals for non-life or limb threatening conditions that, if left untreated, may result in acute events that require specialty intervention to avoid an adverse outcome, which are scheduled within thirty days of approval; Urgent Referrals for non-life or limb threatening conditions that will result in adverse outcomes without specialty intervention and in which referrals may prevent emergency department intervention when the condition cannot wait for an expedited referral, which are scheduled within ten days of approval; and Emergent Care for life or limb threatening conditions. (Docket Entry No. 46, App'x 016.)

Tennessee "in about a month" to serve a second sentence.  Plaintiff was released from TDCJ

and extradited to Tennessee two months later, on May 4, 2020.[2]

The same day that Beck and Hulipas examined plaintiff on March 4, 2020, the Texas

Department of State Health Services confirmed the first positive test result for COVID-19

in Texas.  (Docket Entry No. 46, App'x 141.)  One week later, on March 11, 2020, the World

Health Organization declared COVID-19 a global pandemic.  *Id.* at App'x 005.  Two days

later, Texas Governor Greg Abbott declared a Texas-wide state of disaster due to COVID-19.

*Id.* at App'x 145–47.  On March 22, 2020, Abbott issued Executive Order GA-09, which

ordered

> all licensed health care professionals and all licensed health care facilities [to]
> postpone all surgeries and procedures that are not immediately medically
> necessary to correct a serious medical condition of, or to preserve the life of,
> a patient who without immediate performance of the surgery or procedure
> would be at risk for serious adverse medical consequences or death, as
> determined by the patient's physician.

*Id.* at App'x 150.

As a result of the pandemic, the Texas Correctional Managed Healthcare Policy and

Procedure Committee ("CMHC") was tasked with formulating a prison-wide COVID-19

policy.  *Id.* at App'x 005.  The initial CMHC COVID-19 policy was formulated on March

---

[2]Plaintiff also claims he was denied medical care for the lesion at one or more Tennessee
correctional facilities following his extradition.  Those claims are not part of the instant lawsuit.
Plaintiff filed a section 1983 lawsuit against Tennessee prison and medical personnel in November
2021.  The lawsuit was dismissed in part and remains pending in *Perkins v. Hininger*, C.A. No.
1:23-cv-01178-SHM-tmp (W.D. Tenn.).

20, 2020, and updated on April 2, 2020, largely adopting recommendations made by the Center for Disease Control and Prevention and the Texas Department of State Health Services. *Id.* at App'x 005, 023–054. The policy required that transport of prisoners be curtailed except as absolutely required, such as for releases, bench warrants, and medical emergencies. *Id.* at App'x 032.

HG scheduled plaintiff's in-person dermatology appointment for April 7, 2020. The appointment was scheduled prior to promulgation of the initial CMHC COVID-19 policy. Plaintiff submitted a sick call request ("SCR") to Jester III medical staff on March 18, 2020, in reference to the dermatology referral and reported that the lesion had grown and was oozing. Hulipas responded to the request, notifying plaintiff that his referral to a HG dermatologist had been approved and for him to keep the scheduled appointment for April 7, 2020.

However, HG subsequently canceled the April 7, 2020, appointment "due to covid-19." *Id.* at App'x 005. Beck examined plaintiff the next day on April 8th during an expedited appointment at Jester III. She noted that the lesion looked "suspicious" and ordered a wound culture to check for potential infection. She also ordered daily dressing changes, antibiotics, and pain medication for plaintiff. *Id.* at App'x 022, 057–58. HG rescheduled plaintiff's appointment for April 20, 2020, but Beck asked HG to try to secure an earlier appointment. HG scheduled plaintiff's appointment for April 15, 2020; the

appointment was via telehealth due to COVID-19 limitations on in-person visits.  *Id.* at App'x 150.

At the telehealth visit on April 15, 2020, the dermatologist examined the lesion and charted the following differential diagnoses: "pyogenic granuloma vs. SCC [squamous cell carcinoma] vs. BCC [basal cell carcinoma] r/o [rule out] amelanotic melanoma vs. other." She recommended that a biopsy of the lesion be undertaken once patients were allowed back in the dermatology clinic.  *Id.* at App'x 006, 062–67.  No final diagnosis of the lesion was made at the time, and a one-month or "soon as possible" follow-up appointment was scheduled.  *Id.* at App'x 065.

Plaintiff's medical records show that Jester III medical staff continued to monitor the lesion and undertook dressing changes on a regular basis from April 9, 2020, until plaintiff's release from TDCJ on May 4, 2020.  *Id.* at App'x 070–106.  The medical records do not indicate that the HG dermatologist requested approval for plaintiff to be brought to HG for a biopsy prior to his release from TDCJ on May 4, 2020, or that in-patient restrictions were lifted at HG prior to that date.

The skin lesion was examined by medical providers following plaintiff's arrival at his Tennessee facility in May 2020,[3] and was excised by Tennessee surgeons two months later

---

[3]Tennessee emergency medicine physicians who examined plaintiff on June 5, 2020, found "no obvious indication for hospitalization or emergent operative procedure at this time." (Docket Entry No. 1-1, p. 41.) A biopsy of the lesion was undertaken during the visit, but was non-diagnostic as to cancer. *Id.*, pp. 45–46. Surgical excision of the lesion was performed on July 7, 2020. *Id.*, pp. 68–69. Eight excised sections of the lesion were examined by pathologists. Seven of the sections

in July 2020. It was found to be squamous cell carcinoma. Plaintiff complains here that because he did not receive prompt and adequate medical care at Jester III over the two-month period between March 2, 2020, and May 4, 2020, he had to undergo a more extensive surgical procedure in Tennessee.

B.   Hepatitis C

Plaintiff states that he was diagnosed with hepatitis C in prison in June 2000. Plaintiff's medical records show that defendant PA Wilkins saw him in the Hepatitis C Telehealth Clinic on October 10, 2018. (Docket Entry No. 46, App'x 107–109.) Wilkins informed plaintiff that updated lab work was needed and that various treatment options were available. Wilkins ordered lab work and a six-week follow-up appointment. Lab work was undertaken on October 26, 2018, and Wilkins saw plaintiff for follow-up on November 19, 2018. *Id*. at App'x 111–117. At that time, "[l]ab work revealed [plaintiff's] APRI[4] was 0.53, [meaning] that he was early disease, and not a candidate for treatment at that time." *Id*. at App'x 076, 115. A six-month follow-up appointment was scheduled, along with lab work. *Id*. at App'x 006.

---

were negative for carcinoma; one was positive for squamous cell carcinoma. *Id*., p. 70. The Court includes this information for background purposes only.

[4]An APRI score is a laboratory test score measuring an individual's AST/Platelet Ratio Index. *See Mendez v. Chang*, C.A. No. 2:18-cv-396, 2021 WL 5609855, at *2 (S.D. Tex. June 10, 2021).

Plaintiff was again seen in the Hepatitis C Telehealth Clinic on May 22, 2019. *Id.* at App'x 007, 119–21. The records indicate that plaintiff's lab results were reviewed for disease progression and that his status was "Treatment Deferred Tier 2" as he did not meet treatment criteria at that time. *Id.* at App'x 007, 119. A six-month follow-up appointment was scheduled.

Wilkins saw plaintiff in the Hepatitis C Clinic on November 19, 2019. *Id.* at App'x 007, 123–25. Lab work had not been performed due to plaintiff's brief intervening transfer to another unit, but the lab work was re-ordered with a referral for a liver ultrasound. *Id.* at App'x 007, 123–25. A follow-up appointment was scheduled for twelve weeks. *Id.* Plaintiff failed to appear for his liver ultrasound appointment in January 2020, despite being warned that the ultrasound was part of his treatment and that failure to keep the appointment might result in worsening of his condition. *Id.* at App'x 127–28. Plaintiff's lab work was completed on January 27, 2020, but he failed to appear for a follow-up appointment on February 13, 2020. (Docket Entry No. 46, App'x 130–31, 135.) Plaintiff argues in his response that prison work duties caused him to miss the appointments because "he was the only electrician employed" at Jester III and he was "on call for 24-hours per day." (Docket Entry No. 64, pp. 17.) Plaintiff's appointment was rescheduled for May 13, 2020, but he had been released and extradited to Tennessee by that time. *Id.* at App'x 136.

Plaintiff alleges in his response that he was diagnosed with "significant fibrosis" of the liver on May 22, 2019, and November 19, 2019, but that Wilkins provided no treatment

7

for the condition.  Cirrhosis of the liver was charted as negative.  As noted earlier, plaintiff failed to appear for a follow-up liver ultrasound in January 2020 or for a follow-up appointment on February 13, 2020, prior to his release on May 4, 2020.

C.     Warden Townsend

Plaintiff further alleges that he spoke with defendant Warden Townsend on one or more occasions between March 4 and May 4, 2020.  According to plaintiff, Townsend said at an unidentified point in time that he would "see what he could do" to secure an earlier appointment for him at HG.  However, plaintiff was not notified of an earlier appointment date other than the April 15, 2020, HG telehealth appointment.  Plaintiff was released from TDCJ and extradited to Tennessee on May 4, 2020, without having undergone a biopsy. He faults Townsend for failing to obtain an earlier HG appointment.   Plaintiff states that Townsend told him he had "tried to do what he could," but plaintiff argues that Townsend "did not sound convincing."

D.     Claims

Plaintiff claims that all four defendants were deliberately indifferent to his serious medical needs regarding the skin lesion and hepatitis C.   He seeks $4 million in compensatory and punitive damages against them in their individual capacities.

Defendants argue that plaintiff failed to exhaust his administrative remedies prior to filing this lawsuit, and that the claims must be dismissed as unexhausted.  In the alternative, they contend that plaintiff fails to demonstrate that they were deliberately indifferent to his

serious medical needs, that he raises no genuine issues of material fact precluding summary judgment, and that they are entitled to qualified immunity.

## II.   SUMMARY JUDGMENT STANDARDS

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  If the movant satisfies its initial responsibility of showing the absence of a genuine issue of material fact, the burden shifts to the nonmovant to identify specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 106, 323 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Where the nonmovant bears the burden of proof at trial, the summary judgment movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but need not, negate the elements of the nonmovant's case to prevail on summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  A complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 323.

Once the movant shows entitlement to judgment as a matter of law, the nonmovant must bring forward evidence to create a genuine issue of material fact. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Liberty Lobby, Inc.*, 477 U.S. at 255. However, allegations in the nonmovant's complaint are not evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). Even verified allegations cannot defeat summary judgment if they are conclusory allegations, unsubstantiated assertions, or constitute only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see also Hunt v. Pierson*, 730 F. App'x 210, 212 (5th Cir. 2018).

The summary judgment process does not involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020). Disputed factual issues must be resolved in favor of the nonmoving party, *Little*, 37 F.3d at 1075 (5th Cir. 1994), and all reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

Because plaintiff is proceeding *pro se* in this lawsuit, the Court construes his pleadings liberally, subjecting them to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). Even so, *pro se* litigants must

10

still abide by the rules that govern the federal courts. *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014).

## III.   EXHAUSTION OF REMEDIES

A.   <u>Legal Standards</u>

Under 42 U.S.C. § 1997e(a), a prisoner must exhaust all available administrative remedies before bringing a civil rights claim based on allegations occurring while imprisoned. The prisoner must strictly comply with administrative deadlines and other procedures with no exceptions. *Ramirez v. Collier*, 595 U.S. 411, 421 (2022). "District courts have no discretion to excuse a prisoner's failure to properly exhaust the prison inmate grievance process before filing their complaint." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012). *See also Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("[U]nder our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly."). Thus, a prisoner does not establish exhaustion or raise a genuine issue of material fact as to exhaustion by arguing that he sent letters or informal notices that were not proper step 1 or step 2 grievances under the established administrative procedures. *Id.*

"Since exhaustion is an affirmative defense, the burden is on [the defendants] to demonstrate that [plaintiff] failed to exhaust available administrative remedies." *Dillon*, 596 F.3d at 266. Defendants in this case present probative summary judgment evidence that, as

applicable to Texas state prisoners, TDCJ promulgated a formal two-step grievance procedure for exhausting administrative remedies.[5] (Docket Entry No. 46, App'x 187–190.) Prior to filing a grievance, a prisoner must try to resolve the issue informally. If that does not work, the prisoner must submit to appropriate prison officials a step 1 grievance within fifteen days of the alleged incident or occurrence. When filing a grievance, an inmate must clearly state the specific action required to resolve the complaint. Prison officials then have forty days to decide the grievance. If the prisoner remains dissatisfied, he may appeal by filing a step 2 grievance within fifteen days. Prison officials have another forty days to issue a decision on the appeal. Only after exhausting both steps of the grievance process may a prisoner pursue a federal lawsuit. *See* 42 U.S.C. § 1997e(a).

Defendants in the instant case show that this grievance procedure was available to plaintiff as a TDCJ prisoner at the Jester III Unit as to the claims raised in his complaint. In support of their motion for summary judgment, defendants submitted probative evidence showing that plaintiff filed only one grievance – a step 1 grievance regarding his hepatitis C treatment – between January 1, 2019, and January 18, 2022. (Docket Entry No. 46, App'x 151–86.) Significantly, and as discussed below, plaintiff did not submit a step 2 grievance

---

[5]*See also* Texas Department of Criminal Justice, Offender Orientation Handbook (Feb. 2017) at http://www.tdcj.state.tx.us/documents/Offender_Orientation_Handbook_English.pdf (last accessed January 22, 2024). The Court may take judicial notice of the handbook. *See Ali v. Stephens,* 822 F.3d 776, 782 n.5 (5th Cir. 2016); *Cantwell v. Sterling,* 788 F.3d 507, 509 (5th Cir. 2015).

regarding his dissatisfaction with his medical care for hepatitis C, and failed to submit either a step 1 or step 2 grievance regarding treatment of the lesion.[6]

Thus, defendants establish as a matter of law that plaintiff did not exhaust his administrative remedies prior to filing the instant lawsuit. As shown below, plaintiff fails to raise a genuine issue of material fact as to exhaustion of his claims, and defendants are entitled to summary judgment dismissal of his claims for deliberate indifference.

B.    Skin Lesion

Defendants show that TDCJ promulgated a two-step process for exhaustion of prisoner grievances, and that the process as available to plaintiff at the time the claims arose. Defendants establish as a matter of law that plaintiff failed to exhaust his claims against Hulipas and Beck prior to filing this lawsuit.

Plaintiff argues that his claims against Hulipas and Beck should not be barred as unexhausted, as he had no available administrative remedies due to his extradition. However, in presuming that he could not have completed the two-step process, plaintiff fails to show that he ever commenced the two-step process, thus guaranteeing by his own inactions that the process would remain unexhausted. Moreover, his inactions denied prison and UTMB officials an opportunity to take any corrective action in response to a grievance.

_____

[6]Plaintiff attached a purported step 1 grievance form to his complaint. (Docket Entry No. 1-1, p. 145.) The form does not show that it was received or processed by prison officials, is incomplete, unsigned, and undated, and attempts to cover all events occurring between March 4, 2020, through April 26, 2020. The grievance does not comply with TDCJ grievance procedures. Regardless, plaintiff did not submit a step 2 grievance.

Plaintiff's additional argument – that his skin lesion was an imminent danger that justified failure to exhaust – is foreclosed by *Valentine v. Collier*, 978 F.3d 154, 161–162 (5th Cir. 2020).

Courts are precluded from deciding whether requiring full exhaustion would be unjust or inappropriate in a given case. *Ross v. Blake*, 578 U.S. 632, 641 (2016). Plaintiff's conclusory and unsupported assumptions as to how a grievance would have been resolved, and the length of time a resolution would have taken in his case, do not constitute probative summary judgment evidence that the grievance process was unavailable to him. Plaintiff fails to raise a genuine issue of material fact as to whether the TDCJ grievance process was "available" – that is, whether it was capable of providing at least some relief in his case. *See Ross*, at 642; *Booth v. Churner*, 532 U.S. 731, 738 (2001).

An administrative grievance procedure is likewise unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *See Ross*, 578 U.S. at 644. Plaintiff presents no probative summary judgment evidence that prison administrators thwarted his efforts to utilize the grievance process through machination, misrepresentation, or intimidation. Moreover, his conclusory and unsupported assertion that it is "common" for prison officials to ignore or lose grievances does not raise a genuine issue of materials fact precluding summary judgment in this instance.

14

In his response to the motion for summary judgment, plaintiff argues that the following particular claims cannot be dismissed for failure to exhaust.

### i.    *Referral Designation*

Plaintiff argues that defendants Beck and Hulipas were deliberately indifferent in failing to designate the lesion as needing an "urgent" referral versus an "expedited" referral. (Docket Entry No. 64, pp. 2–3.)

Beck and Hulipas requested an expedited referral to HG for plaintiff during his initial medical appointment on March 4, 2020.  Plaintiff did not file a step 1 grievance as to that action, nor does he show that administrative remedies were unavailable to him at that time. Further, plaintiff did not submit a step 1 grievance regarding any subsequent failure by defendants to "upgrade" his referral designation prior to his HG appointment on April 15, 2020, nor does he show that administrative remedies were unavailable to him at such time. In particular, he fails to show that the grievance process was not capable of providing at least some relief in his case as to the referral designation.  Thus, the record shows that plaintiff did not exhaust these claims.

### ii.    *Sick call request*

Plaintiff further argues that defendant Beck or Hulipas was deliberately indifferent in not examining him as to his SCR of March 18, 2020, or in not requesting an "urgent" referral to HG at that time.  (Docket Entry No. 64, p. 5.)  Plaintiff did not file a step 1 grievance as to those claims, nor does he show that administrative remedies were unavailable to him at

that time.  In particular, he fails to show that the grievance process was not capable of providing at least some relief in his case as to the SCR or referral designation.  Thus, the record shows that plaintiff did not exhaust these claims prior to filing his lawsuit.

### iii.    Email of April 26, 2020

Plaintiff contends that defendant Beck was deliberately indifferent in failing to examine him after nurse Kari Smith sent her an email on April 26, 2020.  (Docket Entry No. 64, p. 7.)  Smith's email relayed her observation of swelling and redness around plaintiff's eyes and head during a dressing change.  Plaintiff did not file a step 1 grievance as to that claim, nor does he show that administrative remedies were unavailable to him at that time. The record shows that this claim is unexhausted.

### iv.    COVID-19 protocols

Plaintiff also claims that defendants were aware as early as March 22, 2020, that protocols had been promulgated regarding prison medical care in light of COVID-19. Plaintiff alleges that defendants were deliberately indifferent in not seeking medical care for him at HG pursuant to the protocols and amended protocols, and in not advising him that his HG dermatology appointment of April 7, 2020, had been canceled pursuant to the protocols. (Docket Entry No. 64, pp. 8–11.)

Plaintiff did not file a step 1 grievance as to those claims, nor does he show that administrative remedies were unavailable to him at that time.  In particular, he fails to show

that the grievance process was not capable of providing at least some relief in his case as to these claims. The record shows that the claims are unexhausted.

   *v.*  *Extradition*

   Plaintiff claims that defendants Beck and Hulipas should not have allowed him to be released from TDCJ and extradited to Tennessee without a biopsy of the skin lesion. (Docket Entry No. 64, p. 8.) Plaintiff did not file a step 1 grievance as to that claim, nor does he raise a genuine issue of material fact that administrative remedies were unavailable to him. This is particularly true in light of his recent argument that Beck and Hulipas should have placed him under a medical hold given their knowledge of his upcoming release and extradition.

   It is clear that the applicable time deadlines for pursuing administrative grievances as to all of plaintiff's claims have long expired, and that the claims should be dismissed with prejudice. *See Marsh*, 53 F.3d at 710 (holding that dismissal with prejudice warranted when administrative relief is time barred or otherwise precluded). Defendants are entitled to summary judgment dismissal of plaintiff's deliberate indifference claims regarding his skin lesion, and the claims are **DISMISSED WITH PREJUDICE** for failure to exhaust.

  C.  <u>Hepatitis C</u>

   Plaintiff alleges that he was diagnosed with hepatitis C in 2000 and was denied treatment in prison for over twenty years.[7] He states that Wilkins diagnosed him with

---

   [7]Plaintiff specifically mentions events that occurred in September 2014, April 2017, October 2018, and May 2019. (Docket Entry No. 64, pp. 13–14.) Plaintiff filed the instant lawsuit in December 2021. Defendants argue, and the Court agrees, that claims against Wilkins that arose prior

17

significant fibrosis of the liver in May and November 2019, but did not offer him treatment. Plaintiff alleges that Wilkins failed to offer treatment even after his APRI score exceeded TDCJ's treatment guidelines.

Plaintiff's sole administrative grievance was filed with prison officials on May 22, 2019. In the grievance, plaintiff complained that he had been on the waiting list for hepatitis C treatment for ten years. As relief, he requested that his condition be treated without further delay. Prison officials responded to the grievance on July 5, 2019, stating that the grievance was unsubstantiated and that plaintiff's treatment status was "deferred tier 2" with further monitoring scheduled for October 2019. No step 2 grievance appears within plaintiff's prison grievance records.[8]

---

to December 2019 are barred by the applicable two-year statute of limitations. *See Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995). Regardless, and as discussed herein, *infra*, plaintiff's deliberate indifference claims against Wilkins are without merit.

[8]For purposes of summary judgment proceedings, a plaintiff must provide more than conclusory assertions of missing grievances in order to create a genuine dispute as to exhaustion. *See Garner v. Moore*, 536 F. App'x 446, 449 (5th Cir. 2013). Here, plaintiff attempted to file new and untimely exhibits in opposition to the motion for summary judgment on September 18, 2023. (Docket Entry No. 65.) He did not seek leave to file the exhibits, and the exhibits were stricken from the record. Among the exhibits was a purported step 2 grievance regarding plaintiff's hepatitis C. However, even assuming the grievance were properly before the Court, the grievance does not show that it was received or processed by prison officials. *Id.*, p. 55. Moreover, the grievance is incomplete and unsigned. Because the grievance form is also undated, it would not constitute probative summary judgment evidence that plaintiff timely and properly exhausted his administrative remedies. Although plaintiff argues that he filed the step 2 grievance on July 26, 2019, and did not receive a response within the required forty-five days, this scenario would leave the claim barred by the applicable two-year statute of limitations.

Plaintiff presents no probative summary judgment evidence establishing that he exhausted his claims against Wilkins as a matter of law. Moreover, he presents no probative summary judgment evidence that the prison grievance process was unavailable to him for purposes of exhausting his claims against Wilkins. No genuine issue of material fact precluding summary judgment is raised. Further, it is clear that the applicable time deadlines for pursuing administrative grievances as to this claim have long expired. *See Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) (holding that dismissal with prejudice warranted when administrative relief is time barred or otherwise precluded).

Defendants are entitled to summary judgment dismissal of plaintiff's deliberate indifference claims against defendant Wilkins, and the claims are **DISMISSED WITH PREJUDICE** for failure to exhaust.

Even assuming plaintiff had exhausted his administrative remedies as to his deliberate indifference claims against the defendants, he fails to present probative summary judgment evidence raising a genuine issue of material fact sufficient to preclude summary judgment as to the merits of the claims, as shown below.

## IV.   DELIBERATE INDIFFERENCE

A.   Legal Standards

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). To prove deliberate indifference, a prisoner must show that the defendants were aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, that the defendants actually drew the inference, and that they disregarded the risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

A prisoner's disagreement with medical providers as to the proper course of treatment or the failure to provide optimal medical care are insufficient to raise a viable Eighth Amendment claim for deliberate indifference. *See Gobert*, 463 F.3d at 349. "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* at 346. A decision to provide additional or different treatment is one left to medical judgment. *Id.* Rather, a prisoner must show that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.*

It is well established that "actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 883 (5th Cir. 2004).

B.      Supplemental Affidavit of Dr. Geddes

Defendants submitted the Supplemental Affidavit of James D. Geddes, M.D., in support of their motion for summary judgment.  Dr. Geddes testifies in his affidavit as follows:

> My name is James D. Geddes, M.D., [Diplomate of the American Board of Internal Medicine], [Fellow of the Royal College of Physicians – Canada]. I am over the age of 18 years, competent to make this affidavit, and have personal knowledge of the facts herein stated. I earned my Doctor of Medicine in 1976 from the University of Manitoba in Winnipeg, Manitoba. I earned my Diplomate of the American Board of Internal Medicine in 1981 and obtained my Fellowship of the Royal College of Physicians and Surgeons of Canada in 1982. I am licensed as a medical doctor by the Texas Medical Board.  I am currently a Regional Medical Director for the University of Texas Medical Branch Correctional Managed Care (UTMB/CMC).  I have been with UTMB/CMC since April 2016.  Prior to April 2016, I worked in private medical practice in Kingsville, Texas since 1982.
>
> I am making this affidavit in connection with [the instant lawsuit].  To prepare for this affidavit, I have reviewed:  1) the correctional medical records of [plaintiff] from December 2019 through May 2020 and 2) plaintiff's [complaint] filed with the Court on December 2, 2021.  I am familiar with UTMB/CMC and Correctional Managed Health Care (CMHC) policies and procedures with respect to the provision of medical care.  I am not receiving any pay, save my usual salary, for review of records or preparation of this affidavit.  I have been asked to review the above referred records in order to provide [an] expert report regarding care provided to [plaintiff] by defendants [Hulipas, Beck, and Wilkins] who were employed by UTMB/CMC during all times relevant to this lawsuit.
>
> In the last four years I have not testified as a witness in court or by deposition. A copy of my curriculum vitae that outlines my education and experience is attached hereto.
>
> Summary of Complaint.  Plaintiff states that in February 2020, he noticed a small growth on his left temple.  The growth began increasing at an alarming

rate and was eventually diagnosed as skin cancer. Plaintiff alleges that as a result of the denial of adequate medical treatment and deliberate indifference exhibited by UTMB defendants Dr. Hulipas and Beck while in TDCJ custody, plaintiff suffered irreversible damage, massive scarring to the left side of his face and head, loss of facial movements, and loss of eye movements that affect his peripheral vision. [Plaintiff] also claims that PA Wilkins denied him [h]epatitis C treatment.

Summary of Care Related to Growth on Left Temple. The records show that plaintiff first reported the growth on his left temple on March 2, 2020, via an I-60 sick call request (SCR). He was seen by NP Beck and Hulipas on March 4, 2020. An Expedited Referral was submitted that same day to Dermatology to rule out [b]asal [c]ell cancer. There was a note in the chart that he was going to be paroled in about a month to be sent to Tennessee for another 20 years.

On March 18, 2020, [plaintiff] submitted a SCR asking about the Dermatology referral. [He] indicated that the spot was bigger now and oozing badly. The response noted that referral was approved and to keep the Dermatology appointment. It was signed by Hulipas. [Plaintiff] was originally scheduled to be seen in the Hospital Galveston Dermatology clinic on April 7, 2020, but the appointment was canceled and rescheduled to a Telehealth appointment due to the COVID-19 outbreak. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. As a result, the Correctional Managed Healthcare Policy and Procedure Committee (CMHC) was asked to begin formulating a policy for COVID-19. Using the Center for Disease Control and Prevention, and Texas Department of State Health Services recommendations, the first CMHC COVID-19 policy was formulated on March 20, 2020, and again updated on April 2, 2020. The COVID-19 policy states, ". . . offender transportation must be curtailed, except for movement that is absolutely required," such as for release, b[e]nch warrant[s], medical emergencies, *etc*.

On April 7, 2020, a SCR was received from [plaintiff] indicating that the wound on his left temple was causing him severe headaches, extreme dizziness, and oozing [pus]. He was seen on April 8, 2020, by NP Beck. [Plaintiff's] vital signs were within normal limits, he denied dizziness or headaches at that time. The lesion was a 3cm x 3cm raised round lesion with redness with bloody drainage. The assessment was a suspicious skin lesion.

A wound culture was performed, and he was ordered Tylenol 325mg two tabs twice daily as needed for 30 days KOP [keep on person] and Minocycline (antibiotic) 100mg one cap twice daily for 14 days KOP. Daily dressing changes were ordered until healed. [Wound culture results deleted.]

On April 15, 2020, [plaintiff] was seen by the Hospital Galveston Dermatology specialist via a Telehealth appointment. The dermatologist noted the lesion was [a] 2–3cm tan and red plaque on his left temple. The assessment was pyogenic granuloma vs. SCC (Squamous Cell Carcinoma) vs. BCC (Basel [sic] Cell Carcinoma) r/o (rule out) amelanotic melanoma vs. other. The differential diagnosis, prognosis and diagnostic/management options were discussed, and a biopsy was recommended when patients [were] able to be brought into the clinic. A one-month follow-up was scheduled.

[Plaintiff] received dressing changes until he left TDCJ on May 4, 2020, when he [was] extradited to Tennessee to serve time.

Summary of Care Related to Hepatitis C Treatment by Wilkins. On October 10, 2018, Wilkins saw [plaintiff] in the Hepatitis C Telehealth clinic for follow-up. Wilkins noted [plaintiff] needed updated labs and the various treatment options available [sic]. Lab work was ordered along with a follow-up visit in six weeks. Lab work was performed on October 26, 2018 and [plaintiff] was seen on November 19, 2018 for his follow-up. Lab work revealed his APRI was 0.53, that he was early in the disease, and not a candidate for treatment at that time. A following [sic] up appointment was scheduled in six months along with lab work. [Plaintiff] was seen in the Hepatitis C Telehealth clinic on May 22, 2019. The record notes that his labs were reviewed for disease progression and that treatment was deferred at that time due to him not meeting the criteria for treatment. A six-month follow-up appointment was scheduled. On November 19, 2019, [plaintiff] was seen in the Hepatitis C Clinic. Labs had not been performed due to a brief unit transfer. Lab work was re-ordered as well as a referral for a liver ultrasound. A follow-up appointment was scheduled for 12 weeks. On January 22 and 24, 2020, [plaintiff] refused his [h]epatitis C appointment. Wilkins also noted [plaintiff] had also refused his ultrasound. [He] was rescheduled for May 13, 2020 but the record notes [plaintiff] was out of TDCJ on bench warrant and to please refer if/when he returns to TDCJ.

<u>Conclusion</u>. In conclusion, based upon my education, training, and experience as a physician in both community and correctional settings, I believe the healthcare provided to [plaintiff] was appropriate and within the standard of care. When [plaintiff] initially complained of the lesion, he was evaluated and an expedited referral to the Dermatology clinic was submitted. Expedited referrals are non-life or limb threatening conditions, if left untreated, that are usually acute events that require Specialty intervention to avoid an adverse outcome. It is my opinion that an expedited referral was appropriate. [Plaintiff] did not need emergent care but he did need a referral to HG Dermatology to have his lesion evaluated.

On April 8, 2020, Beck saw [plaintiff] and ordered a wound culture, and ordered medication for pain and an antibiotic due to suspected infection that was later confirmed with the wound culture results. Due to COVID-19, [plaintiff's] Dermatology appointment had to be rescheduled to a Telehealth appointment because TDCJ patients were only being transferred for emergent reasons. Once the HG Dermatology evaluation occurred on April 15, 2020, it is my expert opinion that the dermatologist did not consider [plaintiff] to be an emergent situation based on the plan of care in the clinic note. The HG Dermatology specialist noted that a biopsy would be done when patients could be brought to the clinic and a one month follow up appointment was scheduled. On May 4, 2020, [plaintiff] was transferred to [the] Tennessee Department of Corrections.

Unit medical providers such as Dr. Hulipas and NP Beck do not have control over approving or scheduling HG Specialty appointments such as HG Dermatology. Referrals are approved by the Utilization Review department and once approved, HG scheduling (Scheduling Entity) makes the appointment.

In regard to Wilkins's treatment of [plaintiff's] [h]epatitis C, I believe the care provided was appropriate and within the standard of care. PA Wilkins ordered an ultrasound of [plaintiff's] liver to evaluate the progression of the HCV virus. In January 2020, [plaintiff] refused the liver ultrasound and his [h]epatitis C follow-up appointment. [Plaintiff] was transferred out of TDCJ before his May 13th follow-up appointment.

Based upon my education, training, and experience as a physician in both the community and correctional settings, I believe that the medical treatment/care

24

provided to [plaintiff] by Dr. Hulipas, NP Beck, and PA Wilkins were both appropriate and performed within the proper standard of care.  I believe any other reasonably well-trained physician, nurse practitioner or physician's [*sic*] assistant under the same or similar circumstances and knowing what the defendants knew at the time, would have provided the same treatment/care and believed that doing so was responsible and done in good faith.

The above opinions are based upon my review of the records noted and reasonable medical probability.

(Docket Entry No. 46, pp. 3–9, footnotes omitted.)

C.     Defendants Hulipas and Beck

Plaintiff claims that defendants Hulipas and Beck were deliberately indifferent to his serious medical needs regarding his skin lesion in the following particulars.

i.     *Referral designation*

Plaintiff contends that defendants Beck and Hulipas should have requested an "urgent" referral versus an "expedited" referral to HG Dermatology on March 4, 2020, and that their failure to make the proper request constituted deliberate indifference.  (Docket Entry No. 64, pp. 2–3.)  He also appears to claim that Beck unlawfully failed to "upgrade" the referral designation on April 8, 2020, when she examined the lesion and ordered lab work to rule out an active infection.

Plaintiff's disagreement with the referral designation constitutes a disagreement with the type or nature of medical care he received and does not rise to the level of deliberate indifference or stand as probative summary judgment evidence of deliberate indifference. *See Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022). *See also Hernandez*, 380 F.3d at

25

883 ("[A]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity."); *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990) (holding that when medical records reflect assessment and treatment of an inmate's medical complaint, there is no deliberate indifference). Moreover, plaintiff's underlying assertion that Hulipas and Beck diagnosed the lesion as cancerous in March or April 2000 is refuted by the medical records, as no such diagnosis appears within the UTMB records. To the contrary, the records show that Beck and Hulipas referred plaintiff to HG Dermatology so that a proper diagnosis of the lesion could be made by an appropriate medical specialist.

Plaintiff fails to raise a genuine issue of material fact sufficient to preclude summary judgment as these claims.

### ii. Sick call request

Plaintiff further complains that defendants Beck and Hulipas were deliberately indifferent in not examining him following his SCR of March 18, 2020, and in not requesting an "urgent" referral to the HG Dermatology Department. (Docket Entry No. 64, p. 5.) In the SCR, plaintiff had asked about the status of the HG Dermatology referral and stated that the lesion had grown and was oozing. However, the probative summary judgment evidence shows that, as of that date, Beck and Hulipas had already requested and obtained an expedited referral to HG Dermatology and that Hulipas instructed plaintiff to keep the appointment. Plaintiff's disagreement with their medical judgment – that an additional

26

examination of the lesion based on the SCR complaints was unnecessary – is a non-actionable disagreement with the nature and type of his medical care. *See Davis*, 35 F.4th at 963.

Plaintiff presents no probative summary judgment evidence that defendants consciously disregarded a substantial risk of harm to plaintiff, or that they refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *See Gobert*, 463 F.3d at 346. Plaintiff fails to raise a genuine issue of material fact sufficient to preclude summary judgment in this instance.

### iii.    Email of April 26, 2020

Plaintiff next argues that defendant Beck was deliberately indifferent in failing to examine him regarding nurse Kari Smith's email to her dated April 26, 2020. (Docket Entry No. 64, p. 7.)  Smith's email had noted her observation of swelling and redness around plaintiff's eyes and head on that date.  However, the record shows that the HG Dermatology Clinic saw plaintiff via telehealth eleven days earlier on April 15, 2020, assessed the skin lesion, discussed a plan of care, and scheduled a one-month follow-up appointment.  The dermatologist had noted that the skin lesion could be skin cancer, a pyogenic granuloma, or "other," and informed plaintiff that a biopsy would be needed once patients were allowed back in the HG Dermatology Clinic.  Moreover, Beck had already ordered daily dressing changes for plaintiff, and provided him antibiotics and pain medication.

27

Plaintiff's disagreement with defendant Beck's medical judgment regarding Smith's email did not give rise to a claim for deliberate indifference, and he fails to raise a genuine issue of material fact sufficient to preclude summary judgment as to this claim.

     *iv.*    *COVID-19 protocols*

Plaintiff argues that defendants Hulipas and Beck were aware as early as March 22, 2020, that COVID-19 protocols had been promulgated regarding prisoner medical care. Plaintiff alleges that defendants were deliberately indifferent in not seeking medical care for him pursuant to the protocols and amended protocols, and in not advising him that his HG Dermatology appointment of April 7, 2020, had been canceled pursuant to the protocols. (Docket Entry No. 64, pp. 8–11.)

Defendant Beck and plaintiff became aware on April 8, 2020, that the HG Dermatology Clinic had canceled plaintiff's April 7, 2020, appointment due to COVID-19, and that HG was rescheduling pending in-person appointments as telehealth appointments. Plaintiff presents no probative summary judgment evidence that defendants were personally involved in HG's cancellation and rescheduling of the appointment or that they were personally aware of the cancellation prior to April 8, 2020. Nor does he present any probative summary judgment evidence that defendants failed to take available actions within the scope of their authority that would have resulted in a HG Dermatology appointment for plaintiff earlier than April 15, 2020. Plaintiff's various assertions of what they could or should have done are conclusory, speculative, and unsupported in the record.

Moreover, plaintiff presents no probative summary judgment evidence that any protocol authorized Beck or Hulipas to set appointments directly or unilaterally with the HG Dermatology Clinic. Again, plaintiff's various assertions of what defendants could or should have done, or his allegation that they "knew for a fact" that the COVID-19 protocols were unconstitutional and should not be followed, are conclusory, speculative, and unsupported in the record. Plaintiff fails to raise a genuine issue of material fact sufficient to preclude summary judgment as to these claims.

     *v.*    *Extradition*

Plaintiff further argues that Beck and Hulipas were deliberately indifferent in allowing TDCJ to release him from custody for extradition to Tennessee without first obtaining a biopsy of the skin lesion. (Docket Entry No. 64, p. 8.) According to plaintiff, defendants should have placed him on a medical hold to prevent his release from prison. In support, plaintiff refers to an undated anecdotal incident he heard from another inmate who was allegedly prevented by medical providers from being released to parole. However, plaintiff presents no probative summary judgment evidence that Beck and Hulipas had any authority to prevent his release to parole or extradition to Tennessee, and no genuine issue of a material fact precluding summary judgment is raised.

Without doubt, plaintiff's skin lesion was an unfortunate and frightening medical condition for him. Nevertheless, the record shows that plaintiff brought the lesion to the attention of defendants Beck and Hulipas two months prior to his release and extradition, and

precisely at a point when the COVID-19 pandemic began wreaking havoc across the globe. Hulipas and Beck examined the lesion and obtained an in-person appointment for plaintiff to be examined by a HG dermatology specialist, but HG delayed the appointment by a week when it switched to telehealth format due to COVID-19. The defendants named in this lawsuit were not involved in and had no authority over the appointment change, and plaintiff presents nothing to the contrary beyond speculation. The HG dermatologist who saw plaintiff during the ensuing telehealth appointment stated that a biopsy would be needed to determine whether the lesion was cancerous, and that a biopsy could be scheduled when patients were allowed back into HG. To the extent any COVID-19 protocols may have allowed the HG dermatologist to request approval for an in-person biopsy appointment, the HG dermatologist made no such request. Again, defendants Beck and Hulipas had no involvement in, and were not responsible for, the HG dermatologist's medical decisions regarding plaintiff's care and treatment.

Defendants Beck and Hulipas attended to plaintiff's skin lesion, provided examinations, medications, care, and referrals to appropriate specialists, and worked within the limitations of their authority as to the scheduling and utilization review process for specialist appointments. The decision to seek an expedited referral versus an urgent referral was one based in medical judgment, and plaintiff's disagreement with that decision does not establish deliberate indifference. Plaintiff proffers no probative summary judgment evidence

raising a genuine issue of material fact as to his deliberate indifference claims against Beck and Hulipas.

Defendants are entitled to summary judgment dismissal of plaintiff's deliberate indifference claims against defendants Beck and Hulipas, and the claims are **DISMISSED WITH PREJUDICE**.

D.    Defendant Wilkins

Plaintiff contends that defendant PA Wilkins was deliberately indifferent to his medical need for treatment of his hepatitis C. Specifically, he alleges that Wilkins failed to provide treatment that was required by hepatitis C policy promulgated by the CMCHCC in coordination with joint medical directors. (Docket Entry No. 64, p. 11.) According to plaintiff, the policy provided that screening, testing, baseline evaluation, and annual evaluations were to be performed by unit level medical providers, and that the unit provider was authorized to determine whether an inmate was a candidate for referral to the UTMB/CMC Hepatitis C Clinic for prioritization, monitoring, and treatment. *Id.*, p. 12.

Plaintiff does not provide the Court with a copy of any policy upon which he relies as having required Wilkins to provide him hepatitis treatment in 2019. To the contrary, he refers to a federal district magistrate judge's opinion in *Moreland v. McCoy*, C.A. No. 2:18-cv-269, 2021 WL 2917109 (S.D. Tex. 2021), and district court decisions in *Roppolo v. Linthicum*, C.A. No. 2:19-cv-262 (S.D. Tex. 2021), and *Davis v. Kwarteng*, C.A. No. 2:22-

31

cv-0076 (S.D. Tex. 2022).[9]  These decisions do not constitute probative summary judgment evidence as to whether Wilkins was deliberately indifferent to plaintiff's hepatitis C viral infection.  *See* FED. R. CIV. P. 56(c)(1)(A).  Nor do they constitute probative summary judgment evidence of any particular prison policy regarding hepatitis C, as the entirety of any policy does not appear within the decisions or in the record in this case.  *Id.*

Even so, the incomplete policy provisions cited within the opinions clearly indicate that prisoners with an APRI score over 0.5 should be referred to a designated HCV clinic for possible treatment but that the decision must be individualized.  The record in the instant case shows that plaintiff was seen in a designated HCV clinic and that Wilkins made an individualized decision as to possible treatment.  Plaintiff provides no probative summary judgment evidence of any particular policy or regulation that mandated Wilkins provide him hepatitis C treatment at any point within two years prior to his filing of the instant lawsuit.

It bears repeating that an inmate's disagreement with a medical provider's professional judgment or treatment decision is insufficient to support a claim of deliberate indifference.  *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). When the medical records reflect assessment and treatment of an inmate's medical complaints, there is no deliberate indifference.  *See*

---

[9]In none of these decisions were the defendant medical providers found deliberately indifferent to the prisoner's serious medical needs regarding hepatitis C.  Plaintiff was not a member of the hepatitis C class action in *Roppolo*, as he was released from TDCJ and extradited to Tennessee prior to class membership determination and settlement approvals by the Court.

*McCord*, 910 F.2d at 1251.  Plaintiff's medical records and his acknowledgment of regular examinations, monitoring, and follow-ups by Wilkins refute his claims of deliberate indifference, and his disagreements with Wilkins's medical judgment and decisions in this case do not give rise to an Eighth Amendment violation.  Plaintiff proffers no probative summary judgment evidence raising a genuine issue of material fact sufficient to preclude summary judgment.[10]

Defendants are entitled to summary judgment dismissal of plaintiff's deliberate indifference claims against Wilkins, and the claims are **DISMISSED WITH PREJUDICE**.

E.   Defendant Warden Townsend

Plaintiff claims that Warden Townsend was deliberately indifferent in his individual capacity because Townsend "elected not to get involved" in the scheduling of plaintiff's appointments at HG Dermatology despite knowing the seriousness of plaintiff's medical condition.  (Docket Entry No. 1, p. 18.)  According to plaintiff, Townsend saw the lesion on plaintiff's scalp, expressed concern about his well-being, and took his name and inmate number so he could attempt to secure an earlier appointment at HG for plaintiff.  Plaintiff posits that, because he never received an earlier HG appointment, Townsend intentionally

---

[10]In his response to the motion for summary judgment, plaintiff argues that he was unable to keep one or more of his scheduled appointments with Wilkins due to time conflicts with his prison work duties.  That plaintiff believes he was justified in missing these appointments does not give rise to a genuine issue of material fact sufficient to preclude summary judgment as to his deliberate indifference claims against Wilkins.

disregarded plaintiff's medical needs by not making a telephone call to obtain an earlier HG appointment for him.

In support of defendants' motion for summary judgment, Townsend submitted an affidavit wherein he testifies as follows:

> My name is Lonnie Townsend. I am over 21 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts herein stated.
>
> I am the Region V Director for the Texas Department of Criminal Justice (TDCJ). I have been employed by TDCJ since June of 2004 and have held every ranking security position.
>
> This declaration is made in response to the lawsuit filed by former TDCJ inmate [Perkins, plaintiff]. Plaintiff claims that I was indifferent to his medical needs while he was an inmate at the Jester III Unit some time in February 2020.
>
> I served as the Senior Warden at the Jester III Unit from approximately November 2019 to March of 2021. I do not recall [plaintiff] or any request for medical treatment that he claims he made to me.
>
> As the Senior Warden, I did not have control over scheduling of inmate medical appointments or over the timing of medical appointments scheduled at Hospital Galveston. The unit medical staff and Hospital Galveston personnel are employed by the University of Texas Medical Branch and they operate under their own policies and procedures.
>
> On occasion, if I observed an inmate in need of immediate medical attention, it was my practice to refer them to the medical department by speaking with the nursing staff or the nurse manager to request that the inmate be laid in and seen on a walk-in basis. Even when I was able to do that, the scheduling of the medical appointments within my unit (non-referrals) was within the discretion of unit medical personnel and I had no authority over when appointments were needed or scheduled.

(Docket Entry No. 46, pp. 191–192.)

In responding to the defendants' motion for summary judgment, plaintiff argues that Townsend

> had the ability and authority to transport the plaintiff to the local contracted hospital if he chose to do so.  And, had the ability and authority to arrange for specialists to arrive at the prison for the sole purpose of treating the plaintiff, or retrieve a biopsy, if he were so disposed to do so.

(Docket Entry No. 64, p. 29.)  Plaintiff presents no probative summary judgment evidence in support of these conclusory assertions as to Townsend's scope of authority.  Plaintiff's unsupported allegations do not controvert Townsend's affidavit testimony that he had no control over scheduling or timing of inmate medical appointments at HG, or that the unit and HG medical staff are employed by UTMB and operate under their own policies and procedures.  In short, plaintiff does not meet his burden of proof to show that Townsend was deliberately indifferent to his need for an earlier appointment at HG Dermatology.  No genuine issue of material fact sufficient to preclude summary judgment has been raised.

Plaintiff directs the Court's attention to an affidavit submitted at plaintiff's request by an inmate at the Jester III Unit.  In his affidavit, the inmate states that he overheard a conversation between plaintiff and Townsend at an unspecified date in March 2020.  During the conversation, plaintiff told Townsend that Beck had "supposedly" made an appointment for him at HG; Townsend took plaintiff's name and ID number and said "he would look into the appointment." (Docket Entry No. 65, pp. 61–62.) During a second conversation a month

35

later, Townsend asked plaintiff if he had heard anything regarding the appointment Beck made at HG.  Plaintiff informed him that the appointment "had been cancelled for no apparent reason" but that Beck was rescheduling it.  *Id.* at p. 62.  Plaintiff asked Townsend if he could "help him get the appointment expedited"; Townsend replied that "he would contact Ms. Beck about the appointment."  *Id.*  Plaintiff told Townsend that he had been granted parole and was "expecting to be extradited to Tennessee any day, to serve another sentence there."  *Id.*  However, the Court struck the affidavit, as it was untimely and filed without leave of court.  Plaintiff did not subsequently seek leave to file the affidavit, and the affidavit is not before the Court.

Even assuming the affidavit were properly before the Court, it provides no probative summary judgment evidence that Townsend was deliberately indifferent to plaintiff's medical needs.  At most, the affidavit shows that Townsend said he would "contact Beck"; Townsend did not state that he would contact HG to obtain an earlier appointment, nor does the affidavit establish that Townsend had the authority to expedite HG appointments.  No genuine issue of material fact would be raised by the affidavit.

Further, plaintiff presents no probative summary judgment evidence that Townsend failed or refused to contact Beck.  That plaintiff was not provided a biopsy at HG prior to his extradition to Tennessee does not constitute probative evidence that Townsend failed or refused to contact Beck.  Even so, plaintiff acknowledges that Townsend later said he had "tried to do what he could"; that plaintiff personally felt Townsend "did not sound

36

convincing" is not probative summary judgment evidence of deliberate indifference on the part of Townsend.  Plaintiff fails to raise a genuine issue of material fact sufficient to preclude summary judgment.[11]

Defendants are entitled to summary judgment dismissal of plaintiff's deliberate indifference claims against defendant Townsend, and the claims are **DISMISSED WITH PREJUDICE**.

F.   COVID-19 Policies

Plaintiff argues in his response to the motion for summary judgment that "the defendants had no justification under the Governor's COVID-19 Executive Order to deny treatment, but contrived an unconstitutional policy aimed at denying medical treatment." (Docket Entry No. 64, p. 8.)  Plaintiff pleaded no claims in his complaint challenging the constitutionality of any COVID-19 policy or that he was denied medical care under any COVID-19 policy, and these claims are not before the Court.  Consistent with plaintiff's failure to raise these claims, defendants have not moved for summary judgment as to such claims.  (Docket Entry No. 45.)

Even so, plaintiff presents no probative summary judgment evidence that defendants Townsend, Hulipas, Beck, or Wilkins had any personal involvement in "contriving," promulgating, or enforcing the Governor's COVID-19 Executive Order or any COVID-19

---

[11]To the extent plaintiff contends that his claim against Townsend arose on or about May 4, 2020, the Court dismisses the claim with prejudice on the merits and not for failure to exhaust.

policy as to his medical care, particularly as to the HG referral and appointment settings. Further, plaintiff acknowledges that his April 7, 2020, HG Dermatology appointment was canceled by HG employees; he presents no probative summary judgment that defendants in this lawsuit canceled the appointment or had the authorization and means to prevent or override cancellation of the appointment.

Plaintiff's challenges to the constitutionality of any COVID-19 policy or defendants' use of any such policy to deny him medical care are not claims pending before the Court. Plaintiff's allegations arising from promulgation, enforcement, or application of COVID-19 policies do not raise a genuine issue of material fact precluding the granting of summary judgment in this case.

G.     Undisclosed Policy

Plaintiff claims in his response to the motion for summary judgment that defendants deliberately failed to disclose a TDCJ policy that allowed them to place a "medical hold" on him to prevent his release and extradition.  According to plaintiff, this policy would have provided a basis for his retention at the Jester III Unit until he could undergo a biopsy at HG at some unknown future point. (Docket Entry No. 64, pp. 30–31.) However, plaintiff raised no claim in his complaint that defendants were deliberately indifferent in not placing him under a medical hold, nor have defendants moved for summary judgment as to any such claim.  The claim is not before the Court.

38

Regardless, plaintiff provides no probative summary judgment of a purported policy that would have allowed, much less required, Beck and Hulipas to place an indefinite hold on his release and extradition of May 4, 2020. To the contrary, he argues in his response that "he had a friend who was subjected to it" in the mid-2000s. *Id.*, p. 31. Plaintiff's conclusory allegations are specious, unsupported in the record, fail to raise a genuine issue of material fact, and would provide no basis for denying summary judgment in this case.

To the extent plaintiff is complaining that defendants withheld discoverable documents, he acknowledges that defendants provided him a copy of a medical hold policy regarding prisoners who are undergoing hepatitis c treatment. He again provides no credible evidence that a medical hold policy existed that would have applied to his situation. No judicial relief is warranted.

H.    Qualified Immunity

When, as here, defendants assert entitlement to qualified immunity in a summary judgment proceeding, "the burden then shifts to the plaintiff, who must rebut the defense." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). To overcome qualified immunity, plaintiff must show that defendants violated his constitutional rights and that the rights were clearly established at the time of the alleged misconduct. *Cleveland v. Bell*, 938 F.3d 672, 675–76 (5th Cir. 2019).

Plaintiff fails to show that defendants were deliberately indifferent to his serious medical needs. Because no constitutional violation is established, defendants are entitled to

39

qualified immunity. Plaintiff's claims for deliberate indifference against the defendants are

**DISMISSED WITH PREJUDICE** as barred by qualified immunity.

### V.   CONCLUSION

For the above reasons, defendants' motion for summary judgment (Docket Entry No.

45) is **GRANTED**, and this lawsuit is **DISMISSED WITH PREJUDICE**.

Any and all other pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the 31st day of January, 2024.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE